WILLIAM S. GRANT, in equity,

*vs.*

WILLIAM W. BRADSTREET, and others.

Kennebec. Opinion July 18, 1895.

</div>

<div align="center">*Equity. Will. Trust ex maleficio. Evidence.*</div>

The respondent, W. B., promised his brother, P. B., that if the brother would refrain from making a will and thus leave the respondent, as heir and next of kin, the sole inheritor of all his brother's estate, he, the respondent, would pay a certain annuity out of such estate to a certain relative of the two parties. *Held;* That such a promise, if acted upon, may be enforced in equity, the court abiding by the case of *Gilpatrick* v. *Glidden*, 81 Maine, 137.

The promise, however, must be proved by clear and convincing evidence, especially where the proof is oral and not in any part written.

The ground upon which equity obtains jurisdiction in such a case is that it would be a fraud for a party to avoid such a contract merely because it is not attended with the usual legal formalities, when the promise may be as certainly and safely proved in equity without such formalities.

In no ordinary case would the court be satisfied to rely on the oral evidence of one witness as sufficient to establish such an alleged promise, especially against the positive denial of the respondent, unless the testimony of the single witness be supported by a considerable amount of direct or indirect corroboration.

It was admissible for the complainant to show, in support of such a promise, that the donor shortly before his death and prior to the occasion when the promise was made, said to another person that he should direct the respondent to make a donation to the complainant; and such testimony has a very strong probative force, in aid of other evidence to prove the complainant's contention.

*Gilpatrick* v. *Glidden*, 81 Maine, 137, affirmed.

IN EQUITY.

On appeal and exceptions by defendants.

This was a bill in equity in which the plaintiff claimed that the late Peter G. Bradstreet of Gardiner, Maine, died intestate,

but before his death instructed his brother, William W. Bradstreet, who in case of such intestacy would be the sole heir to the property of the deceased, that an annuity of one thousand dollars annually to be paid according to the terms set forth in the bill in equity was given to the plaintiff out of the property of the intestate's estate, and that the defendant, Bradstreet, promised the deceased that if he would refrain from making any will he would see this annuity paid to the plaintiff out of the estate of the deceased ; that in consequence of such promise the deceased did refrain from making his will, but that the said defendant, notwithstanding his promises has fraudulently refused to pay the annuity aforesaid. This bill in equity was brought against the defendant and the administrators of Peter G. Bradstreet to compel such payment.

All these allegations were denied by the defendants. An issue of fact was framed at the request of the plaintiff and submitted to a jury, who found for the plaintiff upon the issue submitted. The issue submitted was as follows :

"Did William W. Bradstreet promise Peter G. Bradstreet that if he, the said Peter, should die intestate, and he, the said William W., should succeed to the said property as the sole heir and next of kin, then he, the said William W., would, out of said property, pay to the plaintiff the sum of one thousand dollars a year during the natural life of the said plaintiff, in quarterly payments of two hundred and fifty dollars each, the first payment to be made December 1, 1889, and thereafterwards every three months? Answer. Yes."

(Bill) To the Supreme Judicial Court, in equity :

William S. Grant of Aberdeen, in the State of Washington, complains against William W. Bradstreet of Gardiner, in the county of Kennebec, and State of Maine, and also against Weston Lewis and Everett L. Smith, both of said Gardiner, administrators upon the goods and estate of Peter G. Bradstreet, deceased, late of said Gardiner, and says :

1. That on the thirteenth day of September, A. D., 1889, Peter G. Bradstreet was a resident and inhabitant of said Gardiner and possessed of a large estate, the amount of which the

plaintiff is unable to state, but he is informed and believes that said Peter was then possessed of real estate of the value of fifty thousand dollars and personal property of the value of, at least, two hundred and seventy-five thousand dollars.

2. That on said thirteenth day of September the said William W. Bradstreet was the brother of said Peter, and inasmuch as the said Peter had had no issue and then had no wife, father, mother, sister, nieces, nephews, grand-nieces, grand-nephews or brothers other than the said William then alive, the said William W. was then his expectant heir-at-law and next of kin, and in the event of the death of said Peter would have succeeded to all of his real estate in the State of Maine, and to all of his personal property.

3. That on the said thirteenth day of September the said Peter was suffering from a mortal sickness and was then conscious of the fact that he could not recover therefrom and that his death must soon take place. When so conscious and apprehensive of his early death, the said Peter on said thirteenth day of September gave to the said William W. directions as to what he desired the said William W. to do with his property in case he should die intestate and the said William should succeed to the same as sole heir-at-law and next of kin. And the plaintiff says he is informed and believes that the said William W., among other things, promised the said Peter and gave him to understand that if he, the said Peter, should die intestate and he the said William W. should succeed to the said property as sole heir and next of kin then he, the said William W., would out of said property pay to the plaintiff the sum of one thousand dollars a year during the natural life of the said plaintiff, in quarterly payments of two hundred and fifty dollars each, the first payment to be made December 1, A. D., 1889, and thereafterwards every three months as aforesaid.

4. And the said Peter, relying on the aforesaid promise and undertaking of the said William W., thereafterwards refrained from making a will, and on the seventeenth day of September, A. D., 1889, died intestate, leaving, as the plaintiff is informed and believes, real estate of the value of fifty thousand dollars

and personal estate of the value of at least two hundred and seventy-five thousand dollars; to all of which real estate the said William W., then succeeded as sole heir at law, and to all of which personal property, subject to the payment of the funeral charges, expenses of last sickness, debts and expenses of administration, the said William W. then became entitled as sole next of kin.

5. At a term of the probate court held at Augusta, within and for said county of Kennebec, on the second Monday of October, A. D., 1889, Weston Lewis and Everett L. Smith were duly and legally appointed administrators upon the goods and estate of the said Peter G. Bradstreet, and thereafterwards accepted said trust and qualified by giving bonds as the law directs. Although more than two years have elapsed since said appointment and qualification, the said administrators have filed no inventory and no account. But the plaintiff says he is informed and believes that the said administrators have paid large sums of money and delivered large amounts of securities to the said William W., on account of his distributive share of said estate, in all amounting to one hundred thousand dollars, and that after the payment of all debts and lawful charges there remains in the hands of said administrators personal property of the value of at least one hundred thousand dollars, to all of which the said William W. is entitled by law as next of kin.

6. The plaintiff says that the said William W., succeeded to all of said real and personal estate charged with the trust of paying to the plaintiff the sum of one thousand dollars a year in the manner and at the time aforesaid, and that he obtained and accepted title and right to the same subject to the fulfilment and performance of said trust and now holds the same, and will hold said property now in the hands of said administrators with the trusts imposed thereon by reason of the aforesaid promise and undertaking of him, the said William W.; yet the plaintiff says that he has requested the said William W., to pay to him the amounts so by said William W., to be paid as aforesaid quarterly from and after December 1, A. D., 1889, but the said William W., has refused so to do and further refuses to fulfill said trust

in the future or to make the plaintiff any payment thereunder now or in the future.

The plaintiff prays as follows :

1. That it may be declared that all of the estate of said Peter G. Bradstreet by said William W. Bradstreet, heretofore or hereafter received, and all of said estate in the hands of the administrators thereof to which the said William W. Bradstreet is now or may hereafter be entitled as sole heir and next of kin, is and shall be charged with a trust in favor of the plaintiff for the payment to him of the sum of one thousand dollars a year, in quarterly payments, beginning December 1, 1889, with interest on all overdue payments, to the date of the decree herein and thereafterwards during the natural life of the plaintiff.

2. That the said William W. Bradstreet may be decreed to pay to the plaintiff the several sums due to him under the aforesaid trust, being two hundred and fifty dollars due December 1, A. D., 1889, with interest thereon and a like sum with interest thereon at the end of each period of three months thereafter.

3. That it may be decreed that the plaintiff is entitled to have paid to him out of the estate of Peter G. Bradstreet, received and to be received by the said William W. Bradstreet, the sum of one thousand dollars a year in quarterly payments of two hundred and fifty dollars each, beginning December 1, A. D., 1889, for and during the natural life of the plaintiff, with lawful interest on such of said payments as are now overdue.

4. That the defendant, William W. Bradstreet, may be ordered and decreed to execute such deed or deeds of covenant and give such security for the performance thereof as shall insure to the plaintiff the payment of the aforesaid annuity of one thousand dollars a year, in the manner and at the times aforesaid, for and during the natural life of the plaintiff.

5. That the defendants, Weston Lewis and Everett L. Smith, may be enjoined and restrained from making any further payments from the estate of Peter G. Bradstreet, to the said William W. Bradstreet, until the said William W. Bradstreet shall perform the trusts hereinbefore set forth and as shall be by this Honorable Court declared.

6.   That for the purposes all necessary or proper accounts may be taken, inquiries made and decision given, and that the plaintiff may have his costs of this suit.

7.   That the plaintiff may have such further or other relief as the nature of the case may require and to this Honorable Court shall seem fit and proper.

Wherefore, the plaintiff further prays that each of said defendants may be required to make full, true and perfect answer, but not upon their oaths, answers under oath being hereby specially waived, to all and singular the matters hereinbefore stated and charged as fully and particularly as if the same were hereinafter repeated and they were severally and distinctly interrogated in relation thereto.

And further that this Honorable Court will issue its temporary injunction commanding the said Weston Lewis and Everett L. Smith to make no further payments of money or deliveries of property from the estate of said Peter G. Bradstreet, to the said William W. Bradstreet, his heirs, executors, administrators, attorneys, agents or assigns, during the pendency of this complaint ; etc.

                                              William S. Grant.

Dated November 2, A. D., 1891.

*Heath and Tuell*, complainant's solicitors.

(Exceptions.)

As bearing upon the issue submitted to the jury, the plaintiff introduced as a witness one William G. Ellis, who testified as follows :

" Q.   Now whether or not shortly before the death of your cousin, Peter Bradstreet, you had a conversation with him in regard to William Grant, and if so, when was it?   A. It was the Friday week before he died Tuesday, that is eleven days before.

" Q.   State what the conversation was ? (Objected to and admitted subject to exception.)   A.   He said he was going to tell William Bradstreet to look out for Peter Grant and William Grant and Eliza.

"Q.    Did he state the amounts or sums?    Was the statement any more specific than you have given it?    A.  No, I had no other talk with him after that in regard to that."

To the admission of this evidence the defendants seasonably excepted.    Upon the testimony of Miss Fairbanks, the presiding justice charged the jury in part, as follows:

"Did she hear what she says she did?    And if she did, what was the nature of that transaction?    Was it the intention of Peter Bradstreet to leave it entirely to the discretion of William whether he should have it or not? or was it a request, like all the others, which William had cheerfully assented to and offered to carry out, if no will was made?    As bearing upon this proposition, what was the real intention of the parties, if you find there was a reference made to the name of William Grant, as testified to by this witness?    The testimony of William Ellis was received of what he heard Peter say eleven days before that, tending to illustrate the intention and characterize the reference to the name of William S. Grant, if made as claimed by Augusta Fairbanks.    William Ellis says that eleven days before Peter Bradstreet said to him : 'I am going to tell William to look out for Eliza and Peter and William Grant.'    You will have a right, I say, to consider that as tending to illustrate the nature of the transaction which Augusta Fairbanks testifies to.    Would it tend to show that he was going to tell him to do it, as he did the others? or was he to leave it entirely to his discretion, and he might do it or not, as he saw fit?    It would have some tendency to illustrate the nature of that transaction.    This class of testimony in kindred inquiries is uniformly received.    Questions often arise with reference to gifts made in contemplation of death, gifts of personal property which may be absolutely delivered at the time.    Questions arise whether a given transaction, claimed to amount to a perfected gift, was or not intended as an absolute gift by the alleged donor ; and in reference to such inquiries his previous declarations and letters written by him showing an intention to make provision for the alleged donee have uniformly been received.    So, here, after hearing the testimony of the defense, to which I shall more particularly

call your attention,— after hearing the testimony of William Bradstreet as to what he said to his brother when first they had their interview in regard to these bequests, when he said that he told him he would do whatever he wished him to do, provided no will was made to interfere, you have a right to inquire what was the relation of those parties, what was the state of mind of Peter Bradstreet in regard to his brother. Did he have the utmost confidence that his brother would carry out any such request,—so that in his mind any request of his was substantially the same as a gift? If you find that to be so, then I say to you you would have a right to consider this evidence of William Ellis as having some tendency to establish the issue in this case, if you believe it to be true; because the situation would be closely analogous to the case of an ordinary gift depending wholly upon the express wish of the alleged donor.

It would have no necessary tendency, of course, in an ordinary case, to show that the conversation did take place; because a person may express a desire or intention to do a thing and entirely change it within the next eleven days; but when you find, if you do find, that the relation between them was such that any wish expressed by Peter Bradstreet would be carried out, and was so understood by the parties, fully and freely, as fully as could be expressed, that there was that confidential relation between them, you would have a right to consider this as having some tendency to show what the intention of Peter Bradstreet was. But, as I say, what tendency it does have is entirely for you, or what probative force it shall have is entirely for you, because parties have a right to change their minds, and may have done so."

To this portion of the charge the defendants seasonably excepted.

After the verdict of the jury, the presiding justice without argument ordered a *pro forma* decree for the plaintiff and the defendants filed exceptions, and also seasonably appealed from the *pro forma* decree.

*H. M. Heath* and *O. A. Tuell*, for plaintiff.

Counsel cited: *Towles* v. *Burton*, Rich. Eq. 146, S. C. 24

Am. Dec. 409, note p. 413; *Strickland* v. *Aldridge*, 9 Ves. 516; *Thompson's Lessee* v. *White*, 1 Dallas, 424, S. C. 1 Am. Dec. 252, note p. 258; *Browne* v. *Brown*, 1 H. & J. 430; *Gilpatrick* v. *Glidden*, 81 Maine, 137, p. 156. The English cases approved in *Gilpatrick* v. *Glidden*, go much further than our case. *Hallowell National Bank* v. *Marston*, 85 Maine, 488, in principle requires the sustaining our legal contention.

*Orville D. Baker and L. C. Cornish*, for defendants.

The plaintiff must prove fraud as the only basis on which he can recover; that is, that the defendant, William Bradstreet, solemnly promised his dying brother that he would pay the plaintiff an annuity of one thousand dollars, but after his brother's death he deliberately violated that promise in fraud of the plaintiff. To establish such fraud the plaintiff must prove clearly three propositions :

1. That failing any promise the deceased purposed to leave a formal will and by it to secure the plaintiff's annuity.

2. That, with a view to prevent the making of such a will, the defendant promised to see this annuity paid.

3. That the deceased, induced by such promise on the part of the defendant, refrained from making the will which but for such promise he would have made.

The advisory verdict given by the jury bears solely on the second of these three propositions, namely, whether or not any promise was made by the defendant to pay this annuity to the plaintiff.

The deceased was not influenced to refrain from making a will by any promise of the defendant.

It is not disputed that if the deceased intended to leave a will at all, and the defendant's promises, if made, induced him to forego the making of such will, then equity will afford the plaintiff relief; but the defendant claims that the undisputed evidence here shows that the deceased deliberately purposed not to leave a will under any circumstances; so that his not leaving a will was the result of a settled purpose on his part, and was not affected by anything the defendant promised or failed to promise, and that such a case would not fall within the rule es-

tablished for this State by *Gilpatrick* v. *Glidden*, 81 Maine, 137. As a matter of law, we submit that the burden is on the plaintiff to show not only that the deceased requested, and the defendant promised that the plaintiff's annuity should be paid, but, also, that without such promise a will would have been made, which would legally secure this annuity, and that the absence of such will was the direct consequence of the defendant's promise.

As to the decree in this case, it is clearly stated in the exceptions as signed by the presiding justice, and by the decree itself, that this was rendered wholly *pro forma* without argument by either counsel, and simply as another form of bringing the matter before the law court practically on report, so that they are to consider the case precisely as if presented to them in connection with the jury's verdict for a decree at *nisi prius.*

The defendant is, therefore, entirely unprejudiced by this decree, and the burden is still on the plaintiff to establish to the law court his right to his decree, with such aid as the verdict may bring to the conscience of the court.

As to the effect of the verdict upon this branch of the case, it is a well-settled principle of equity, which needs no citation of authority, that such verdict does not bind the court in the same way as the verdict of law, namely, to be sustained unless manifestly against the weight of testimony, but the verdict itself, together with the evidence, is all addressed to the good sense and conscience of the court; and it is for them to say not whether they approved or disapproved of the verdict, but whether the whole evidence in the case, with the verdict included, gives them such satisfaction upon the facts as would establish the plaintiff's case.

The testimony of Ellis must be excluded from consideration, and the verdict of the jury, being based in part upon illegal evidence, cannot be considered at all by the court.

The testimony of Ellis states that in a conversation with Peter Bradstreet, the deceased, held eleven days before he died, Peter said to him that "he was going to tell William Bradstreet to look out for Peter Grant and William Grant and Eliza."

Now, the defendant claims that this evidence shoots wholly wide of the point to be proved, and is not admissible on any legal theory.

The sole issue for the jury was whether the defendant did or not promise the deceased that the plaintiff, William Grant, should receive an annuity out of Peter's estate. This promise if made, at all, was made on Friday, the 13th of September, 1889. There is no pretense on the plaintiff's part or in the evidence that such promise was made at any other date, but the alleged conversation with Ellis took place just one week before, namely, Friday, September 6th, and, at most, was only an expression of a then existing intention on the part of the deceased to make some provision for the plaintiff, or rather to tell the defendant to make some such provision. The only condition under which such evidence could be legally receivable is where the point to be proved lies not in the acts done or communicated by the deceased, but solely in the intent with which they are done or communicated.

The degree of proof necessary: It is submitted that in a case like this, addressing itself to the equity of the court, and practically creating a will where the deceased has purposely refrained from making one, the burden of proof rests strongly upon the plaintiff, and all necessary facts must be shown by clear and convincing proof which shall leave a moral certainty in the minds of the court. Such a case, we submit, demands much more than a mere assertion of a single witness who had no interest to remember, contradicted by the evidence of the party whose duty it was to know, and unsupported by a single collateral fact or witness.

Now, in the case at bar, where the plaintiff has produced no written wish of the testator, will not the court require, if not the same formality, at least the same overwhelming certainty of proof as the common statutes of the land require, even when the testator's own hand has fixed his wishes in writing?

The doctrine of *Gilpatrick* v. *Glidden*, is at best a somewhat daring innovation from the common law. It creates or radically alters a will of a man after he is dead, and on merely oral proof

distributes his property in a way different from that established by his own probated will, or by the laws of the land. The smallest safeguard which the rights of property and of the dead can demand is that in applying this somewhat dangerous doctrine the court should feel sure of the facts on which it is asked to act.

The plaintiff here has offered the testimony of a single witness, Augusta Fairbanks, opposed by the solemn statement of the old man, who was charged with the trust, and who is admitted by the testimony to have carried out scrupulously and even liberally every other trust committed to him by his brother.

In *Gilpatrick* v. *Glidden*, the testimony on the facts was practically undisputed, plaintiffs introducing witness after witness, in the neighborhood of a dozen, in all, and the defendant introducing one witness only, and she virtually confirming the very trusts claimed by the plaintiffs.

In *Gilpatrick* v. *Glidden*, the plaintiffs had the testimony of a trusted adviser, who was especially called in by the deceased and the defendant for the purpose of consulting as to the agreement of the plaintiff, and sought to prove by a witness whose attention was especially charged with the subject matter of the interview.

In the case at bar, the plaintiff produces no evidence from any one called in as an adviser or charged by the deceased with any responsibility of remembering.

In *Gilpatrick's* case the plaintiffs produced next the testimony of the scrivener who was called in to draft the will and who heard the agreement repeated by both parties in his presence at the time the will was signed.

In the case at bar, the plaintiff produces no single witness who was even present in the same room at the time of the alleged agreement, but only one who at most was merely an eaves-dropper in another room, who overheard scraps of a conversation not intended for her ears concerning people whom she had never seen and touching matters as to which she had no duty to perform.

In *Gilpatrick* v. *Glidden*, the plaintiff produced witness after witness who testified to the repeated declarations of the

defendant admitting the trust in the precise terms claimed by the plaintiff; in the case at the bar, the plaintiff has produced no witness to testify to any declaration ever made by this defendant that any trust was declared in favor of the plaintiff.

In *Gilpatrick* v. *Glidden,* the plaintiff proved the actual making and signing by the defendant of a writing which if it had not afterwards been lost or destroyed, would have been an execution of the trust claimed. In the case at bar, the plaintiff has produced no evidence of this nature.

Against the testimony of Augusta Fairbanks, therefore, we set: (1) The clear and emphatic memory of the defendant that the plaintiff's name was never mentioned to him by his brother as an object of bounty. (2) The contemporaneous and original evidence of the memoranda themselves which contain a rough sketch of every other legacy contemplated by the deceased but are significantly silent as to the plaintiff. (3) The witness Fairbank's lack of opportunity or interest or duty to hear or remember. (4) The complete absence of any memoranda by her which might refresh her recollection. (5) Her complete and uniform inaccuracy as to the terms of every trust which she partially heard, and her complete forgetfulness of the other trust and subjects which were in fact spoken of by the deceased. (6) The admission of Miss Fairbanks to Joseph Bradstreet, now dead, that she had very likely confounded the name of Peter Grant, an actual legatee, with that of William Grant, an imaginary one. (7) The after-conduct of the defendant himself and the scrupulous zeal with which he more than executed every other trust which his brother committed to him. What possible motive had he for violating and fraudulently suppressing this trust alone?

SITTING: PETERS, C. J., WALTON, FOSTER, HASKELL, WISWELL, STROUT, JJ.

PETERS, C. J. On the trial of this cause in equity the jury found, as a matter of fact, that the respondent, William W. Bradstreet, verbally promised his brother, Peter G. Bradstreet, during the last sickness of the latter, and but a few days before

his death, that, if Peter should die intestate, leaving him, William, as his sole heir and next of kin to succeed to all of Peter's estate, he would pay, out of the estate so to be inherited by him, to William S. Grant, the complainant, one thousand dollars annually during the complainant's natural lifetime.

That such a promise, if fully and absolutely proved, may be enforced by a court of equity as a charge upon the estate of the intestate, however hazardous or impolitic such a precedent may to some minds seem to be, is an established doctrine in this State, as carefully elucidated and maintained in the late important case of *Gilpatrick* v. *Glidden*, 81 Maine, 137. Evidently, the risk of accepting and acting upon such doctrine consists mainly in the temptation which judges and juries are subjected to through sympathy or misunderstanding to allow these irregular dispositions of property to be established upon untrustworthy and insufficient evidence.

Therefore, when those legal formalities which are usually observed for conveying or transmitting property are to be dispensed with in favor of equitable rules on the subject, the facts upon which the equitable superiority is to be allowed should be established by clear and indubitable evidence. And this requirement applies with great force in the present case, where the complainant's claim could be legally proved only by a will signed by the donor and attested by three witnesses, whilst it is proposed to be equitably proved mainly by the testimony of a single witness without being evidenced by any writing whatever. Equity herself assures us that in such a case the evidence must be strong and certain enough to produce conviction in every reasonable mind. The very ground upon which equity obtains jurisdiction in this class of cases is the plea set up by her that it would be unjust and fraudulent to require that parol gifts shall fail of effect merely for want of legal formalities to uphold them, when in equity procedure the necessary facts can be just as surely though differently proved. The argument in behalf of the equitable jurisdiction is that the only object of strict legal forms is to attain a high degree of certainty in such important matters, and that just as much certainty can be assured in equity as by the legal requirements.

Whether the evidence adduced in support of this claimant's case can stand the test, which we make the standard for judging this case and all such cases, is the question here. The complainant is obliged to rely greatly on the testimony of Augusta Fairbanks, who undertakes to reproduce the substance of a part of a conversation between the two Bradstreets which she overheard when in a room adjoining the one they were in at the time referred to. Most of the circumstances attending the situation of the parties at the time are not disputed.

The interview between the brothers took place Friday forenoon, September 13, 1889 ; Peter's death occurring on the Tuesday next afterwards. William was then seventy-two years old. Peter was the elder of the two, and never was married. He died intestate, leaving his brother the inheritor of all his property. They had been partners in business for nearly a lifetime, and had acquired large estates both jointly and individually. They had the confidence of the community as business men, and each had an unlimited confidence in the integrity and business ability of the other. The complainant was a second cousin of Peter Bradstreet, as also was Peter Grant, whose name will appear hereafter. Another prominent figure in the sketch was Eliza Ferguson, who had been a faithful and trusted housekeeper for Peter Bradstreet for many years.

Miss Fairbanks, the witness, a resident of West Gardiner, and evidently a person of mature character and of more than ordinary intelligence and education, for one in her station in life, commenced to do house-work for Peter in February, 1889, continuing in that employment exclusively, until Peter was taken sick, about three weeks before his death, when she took charge of him as his nurse and continued in that capacity until he died. On the morning of the day in question, William came to his brother's room, as he was in the daily habit of doing, and left word that his brother should see no callers that morning as he was to do some business with him, which would require all his brother's strength. Miss Fairbanks, thereupon, bolstered up the sick man with pillows under his head in readiness to see William, and she then retired to her own room in the rear of the sick-

room, not seeing William when he came in the room nor during the time he was there, but hearing him. She left the doors open between the two rooms so that she could hear if she should be called for anything, and was lying, during the conversation between Peter and William, on her back upon her own bed for the purpose of obtaining rest.

The house is an old-fashioned two-story dwelling facing the Kennebec river in the city of Gardiner, with four rooms both above and below, and Peter's bed was in the south-east corner of the front room up stairs, the corner farthest off from the passage-way between his room and the room of Miss Fairbanks. Her bed was in the south-west corner of her room, in the rear of his, being the corner of her room the most distant from such passage-way. So that the whole distance between the two beds was the greatest attainable in the two rooms, excepting that neither bed was exactly in a corner, as a space was left between the bed and the walls in either room wide enough to allow a person to get around the beds. The rooms were of rectangular shape, his measuring fifteen feet four inches by fourteen feet one inch, and hers measuring fifteen feet four inches by twelve feet ten inches. The space or passage-way between rooms measures about three feet in length. A light-stand in his room, mentioned in the testimony, was about three feet by eighteen inches.

The foregoing statement leads up to the testimony of Miss Fairbanks touching the main issue in the case, and we quote from her direct examination :

" Q. Just before William returned to the room did Peter give you any directions as to where to go or what you should do ? A. Yes, sir, he did.

" Q. In consequence of the directions that you received from him then what did you do and where did you go ? A. I went into my room and laid down on the bed, ready if he called me to go in, as I expected he would.

" Q. While you were lying down on the bed who came into Peter's room, if anybody ? A. William Bradstreet.

"Q. And what, so far as you know, did he first do when he went into the room? A. First, I remember of his moving a stand out and heard him handling paper on the stand, and he sat down and talked with Peter Bradstreet for sometime. I heard him call several names, but I did not hear the first part of the conversation because I did not interest myself in it; I could not repeat it.

"Q. What was the first conversation that you recollect and that you noticed? A. First, I heard them talking about having Mr. Ellis come down that day, telegraphing for him to come down. That is the first thing I remember of their saying.

"Q. What next do you recollect? A. Then the next I took notice of was when he spoke of Miss Ferguson, providing for Miss Ferguson. Knowing her I was interested in the talk and noticed what was said.

"Q. What did you hear said about Miss Ferguson? A. I heard the request that Peter Bradstreet made, what they decided on, the amount to be left her, and the way it should be left, and heard considerable talk made in regard to her. Peter Bradstreet was very anxious that she should be provided for. (Objected to.)

"Q. State the substance of what you can recollect that Peter said about Eliza Ferguson? A. I cannot repeat the conversation of both. He said he wished her to have an income, a quarterly income of four dollars a week, and he proposed some way that it should be left her, and something was said about its being left to her in trust, a certain income being drawn from a certain amount, and that he wanted a special provision made for her; spoke of certain amounts, and finally decided on a certain amount.

"Q. What was the amount they finally decided upon? A. Eighteen dollars a week. Took several amounts and he finally decided on eighteen dollars a week — special provision made for her.

"Q. What was said next? A. After they talked about that — it was some little time — Peter Bradstreet said he wanted to provide for William Grant; said perhaps he had better leave it to him the same way he did for Eliza, pay it to him quarterly.

"Q. What did William say to that? A. He thought it was a good idea and agreed to it,—seemed to think as he did about it, that it had better be paid in that way, and Peter said William Grant he would leave a thousand dollars a year, payable quarterly, commencing the first of December.

"Q. What did William say in the talk? A. They spoke of what this income should be taken from, and from their conversation he agreed to carry out the request.

"Q. State as nearly as you can just what William said, not the exact words, but the substance of it, as you can best recollect it? A. The exact conversation I did not remember, but I knew what they meant when they were talking and understood it at the time they were talking. I heard it at the time but I forget the exact conversation between them.

"Q. Do you mean to say you have stated the substance of it as you recollect it? A. Yes, that is the substance. The exact language I do not undertake to recall.

"Q. Was anyone talked about after completing the talk about William Grant? A. Then he said he wanted to provide for Peter Grant, and thought he would leave that in the same way he did Mr. William Grant's. He said he wished to give him five hundred dollars a year, payable quarterly, commencing the first of December.

"Q, What did William say in respect to that? A. He thought favorably of it and agreed to carry out the request.

"Q. Was anything said in the conversation about this being safe? What was there about that? A. Yes, when providing for Miss Fergurson. He said he wanted her provided for so that nothing ever would happen that she would be dependent, and he proposed some way that it should be left to her, or William spoke of some way that it should be left to her, and Peter Bradstreet seemed to feel a little doubtful about it, and Mr. Bradstreet said it was safe, there never would be any trouble or danger; that she was safely provided for, as safe as could be at all.

By the Court:

"Q. How much did you say was agreed upon for her? A. Four dollars a week, her regular income at first.

"Q.   What about the eighteen dollars?   A.  That seemed to be a special provision made for her.

Direct :

"Q.   After this did you have any talk yourself with Peter about William?  A.  No.  I also never had any talk with William Bradstreet about it.

"Q.   And after Peter's death did you have any communication of any kind with the plaintiff, Mr. Grant, in regard to the matter? A.  No, sir.

"Q.   How long after his death before you spoke of it to anybody?  A.  The first of November, I spoke of it first.

"Q.   When in November?  A.  It was the first week in November, I could not state the date.  It was in 1889, about six weeks after he died.

"Q.   Now do you know what the relations were existing between Peter Bradstreet and William Grant, or did you know, during the life of Peter Bradstreet?  (Objected to and admitted.) A.   I did in a measure know.

To Mr. Baker :   William Grant was not at the house at any time when I was there.

"Q.   State from whom your information came in regard to their relations?  A.  Mr. Peter Grant."  (Peter Bradstreet?)

We quote also from the cross-examination of Miss Fairbanks :

"Q.   Then what did you hear next?  I heard him move a stand out and rattle paper on the stand, and sit down and get up.

"Q.   Where was this stand kept that you speak of?  A. Right next to the chair.  From the hall door to the door of my room was a commode and the stand and a chair.

"Q.   That would be along the north wall of the sick room? A.  Yes, sir.  I heard him move the stand from there out towards the center of the room.

"Q.   You could distinguish the direction in which it was moved by your mere sense of hearing?  A.   No, I could not tell just the direction, but it was moved out.

"Q.   How much of a stand was that?  A.   Two feet wide and three feet long.   It was just a light-stand.

"Q. Now after you heard the stand moved out, as you say, towards the center of the room, you heard the rattling of paper did you? A. Yes, sir.

"Q. What sort of sound of paper, newspaper or writing paper, or what? A. It was writing paper that is always on the stand there.

"Q. Ordinary note paper in size, or what kind of paper? A. I could not say what kind of paper; I don't remember. I heard the paper being rattled.'

"Q. And that was just before you heard the stand moved was it? A. Yes, sir.

"Q. Was there pen and ink there in the room to do this writing with which you speak of? A. I don't think there was.

"Q You were not requested to bring any and did not bring any? A. No, sir, not at that time, not while William Bradstreet was there.

"Q. Then did you hear the sound of writing after you heard the paper rattle and the stand moved out? A. I did after a while, but not directly after.

"Q. How loud a noise was this sound of writing that you heard, quite distinct and loud? A. No, loud enough so I could hear it. I heard it during his interview with him.

"Q. Across your room and through the passage way and across his room you heard readily the sound of writing? A. Yes, sir.

"Q. Was it writing with a pen or pencil that you heard? A. I don't think it was with a pen and ink.

"Q. You could distinguish at that time and noted it that this sound of writing you heard was pencil writing? A. No, it was not from the sound that I judge from.

"Q. It did not make a sound as of pen and ink you say? A. I did not judge from the sound that I heard.

"Q. I did not ask you that, but simply whether it did make the sound of pen and ink writing? A. I don't remember about that; I don't remember what I judged from.

"Q. But you heard the sound of the writing? A. Yes, sir.

"Q. And that was distinct? A. Yes, sir.

"Q. And you concluded it was lead pencil writing? A. I didn't think anything about it at the time, whether lead pencil or what it was.

"Q. If you didn't think anything of it at the time, when did it afterwards become important for you to remember? A. In thinking it over I judged it was lead pencil, because —

"Q. I don't ask you your reasons, but simply when it first came into your mind to distinguish between the sound of pen and pencil in writing in that room; how long after was it? A. I don't remember; sometime after. I had occasion to think of it, and from certain reasons I judged it was a pencil.

"Q. How long a time did you hear the sound of this writing of pencil across those two rooms and passage way? A. At different times, during the time he was there.

"Q. And was this sound of lead pencil writing usually followed by the rattling of paper? A. Yes, sir.

"Q. And those different noises, the man sitting down and writing with a lead pencil, you distinguished while you were lying on the bed across the two rooms and passage way, did you? A. Yes, sir. . . . .

"Q. Did you hear writing done during the conversation as to the Grants, or either of them? A. I could not say that I remember any special time that I heard it, but I heard it after that several times.

"Q. Either during or immediately after the conversation that you thought you heard with reference to William Grant, the plaintiff here, did you hear this sound of writing and the rattling of paper? A. I presume I did; I could not say for certain; but I heard it directly after that. I heard the writing all the time, or occasionally during the interview.

"Q. So that the sounds of writing ran right along with the conversation? A. O, no; the writing was at different times in the conversation."

It certainly gives weight to her testimony that Miss Fairbanks in the foregoing sketch of important events, shows her possession of a strong intelligence, and it adds still more weight to her statement that her character for integrity cannot reasonably

be questioned. Upon the most careful scrutiny of all the evidence no motive is seen that would be likely to induce her to suppress or pervert the truth. She stood virtually in the attitude of a stranger to all the parties interested in her testimony. The most that can fairly be urged against the literal truthfulness of her narrative is that in her description of the movements in the sick room she possibly may have been unconsciously led into some exaggeration of certain of the less important particulars, influenced as she naturally would be by her own inferences as to the purposes of such a meeting.

And, still, we should be averse to accepting her testimony, or that of any other single witness, upon which to establish such an important result as the complainant claims, unless the testimony of the single witness be supported by a considerable amount of direct or circumstantial corroboration. Such a heavy structure may not be so safely sustained by a single column, however sound its material may be, as it would be with the aid of other even much less substantial supports. And especially should this caution be adhered to in the present case in view of the positive denial of the complaint's contention by the principal respondent, the only other living witness who was present on the occasion described by Miss Fairbanks. Happily, however, the present case discloses important evidence in corroboration of the story of the principal witness for the complainant.

William G. Ellis, a second cousin of the Bradstreet brothers, and also of the complainant, testifies that Peter Bradstreet just eleven days before his death, and that would be just a week before the interview testified to by Miss Fairbanks, told him at his bedside that he should tell his brother William to look out for William Grant, Peter Grant and Eliza Ferguson. Ellis further testifies that the relations between Peter Bradstreet and William Grant (complainant) were very friendly and that he had written during the last few years of Peter's lifetime many letters from Peter to him. That Ellis correctly reports what Peter said to him is not questioned, but it is contended by the defense that the evidence is not admissible. We are confident that the evidence was not only admissible, but that it has great

probative force as clearly indicating the disposition and intention of Peter. It prevents the defense from setting up any argument of improbability. It would ordinarily take much less evidence to prove that an act has been done by a person if such person has previously expressed his intention and desire to do the act. A man is very likely to do any reasonable thing which his heart strongly inclines him to do, and especially if the performance of the act imposes no unwilling burden or responsibility upon himself. These propositions are very strong in the present case because the circumstances are exceedingly favorable for their application. There seems to be an unnaturalness in a gift from Peter Bradstreet to Peter Grant and none to William Grant, the one being as needy and deserving as the other, and William being with the donor evidently his favorite of the two.

Other corroboration of the testimony of Miss Fairbanks will be noticed when we come to an examination of certain papers introduced by the defendants as a part of their case.

The complainant invokes in his behalf the favorable verdict of the jury, and inasmuch as the question submitted to that tribunal was not in its nature difficult or involved, but consisted of the simple proposition whether the witness for the complainant heard, as she said she did, a direction from the one brother to the other to make the alleged pecuniary provision for the complainant, we think that the conclusion arrived at by the jury on that question should have great weight at our hands. And of still more consequence is the verdict to our minds because it has been virtually approved by a decree in affirmance of it by the presiding judge.

We notice on the record that the counsel consented that the decree filed by the court should be regarded as merely formal, a proceeding which, if full effect be given to it, deprives the sitting justice of any opinion at the hearing in the first instance and by statutory provision of any vote at the appellate hearing, still we cannot very easily free our minds of the conviction that the learned justice, who so generously allowed the case to pass by him without more than a formal assent to the verdict of the

jury, never would have filed such a decree in such a case if he thought it to be wrong upon the law and evidence.

William W. Bradstreet, the principal respondent, testifies that he used no light-stand in his interview with Peter, and no writing materials beyond two bits of paper, writing upon them with a pencil there and immediately afterward partially with pen and ink, and that he sat at the time by Peter's bed-side, making just as little conversation with him as they could get along with. And he produces from his possession, in confirmation of his statement, two small papers which read as follows:

<div align="center">(Defendants' exhibit 2.)</div>

"*Sept. 11-1889*

*Peter wants Ben M. Bradstreet to have $5000.00 right out*
*Eliza to have an income of $4 to 18 per week as she may need*
*for her support and comfort.  commence 1st week Decr.*
*P. Grant say $5 to 10 per week*
*Wm Peacock $100.00 right out*
W. G. Ellis $10.000

P. Grant 500 per year & if necessary up to $1000

"W. Lewis has $5.000 East Side R R bonds in his hands belonging to P. G. B.

"1100 Gardiner N Bk stock in P G Bs name belonging to the daughter of Uncle Chas Bradstreet cannot be transferred to him without the consent of his daughters

"Bills of sale of vessels from Geo. C. Morrell to P. G. B. not signed

"Sept. 13-1889

"Peter told me this morning that whenever Jos or Fred had approached him in regard to the Roach River land he always avoided saying anything that might affect my rights & also said that he had no reason to changed his opinion which he had namely that Father furnished his part of the money for his interest in the land       W. W. B."

(Part italic is in pencil, other in ink)

(Defendants' exhibit 3.)

"1100 Gardin Bk Stock in P G. B name belongs to uncle Chas daughters cannot be transferred to uncle Chas with the consent of his daughters

P Grant 500 per year more up to 1000

1st week in Decr.

$5000. East side R. R. bonds in W. Lewis hands

Eliza 4 up to 18 per week 1st week in Decr

W. G. Ellis    10

1, oz sub Nitrate of Bismuth " (a)

(a) All in pencil except last item

Defendants' Ex. 3 is made on an envelope directed to "Mr. W. W. Bradstreet Gardiner Maine "

Printed on envelope " Return to Brewster, Cobb & Estabrook, Boston. Mass., If not delivered within 5 days."

Post mark "Boston Mass. 1889 "

One of these papers, as before indicated, is a letter envelope which had been previously used as such, and the other, of about the same size, is evidently a leaf from a small pocket memorandum book. The two pieces have the appearance of having been used together, the items commencing upon one and being continued on the other. Mr. Bradstreet's memory had become very confused and unreliable at the time of the trial, and he seemed unwilling or unable to state any details or particulars without being guided by the papers above transcribed. Still, he says he could at any time have told the names of those who were to be the recipients of Peter's bounty and the amounts they were to have.

Each side in the controversy claims favorable inferences to itself from these papers. They are the only written memoranda produced, and even these so far as in ink were not written at the bedside of the sick man but at some other place soon afterwards. They indicate on their face that William Bradstreet had not a methodical memory and that he did not confidently rely on such memory as he had.

Bearing in mind that Miss Fairbanks testified before these papers were produced, and at a time when she had not known

or heard of them, it will be noticed how completely in some respects, and partially in other respects, her testimony is sustained by them; the principal and important difference between the papers and her testimony being that the former nowhere thereon contains the name of William Grant. She understood that Peter Grant was to have five hundred dollars per year, while Bradstreet gets it upon the papers that he was to have that sum, and up to one thousand dollars if necessary. She says Eliza was to have four dollars per week and eighteen dollars per week besides if she needed it. He gets it four dollars up to eighteen dollars a week, according to her necessities; not a strange difference of understanding that matter.

In other particulars her statements are in closer accord with the items appearing on the manuscripts, and sometimes substantially if not exactly coincident with them. She says Peter was anxious that there should be no failure in the provision for · Eliza, and that he several times repeated his wishes in regard to it. Does not William, perhaps unconsciously to himself, transcribe the same idea in his own words when he adds to the gift to Eliza, the words, "for her support and comfort?" The witness says there was considerable talk over the · question of creating trusts for the security of the gifts to be made, and while the word trust does not appear on these papers it is implied by them; and William subsequently created trusts of the kind that was talked about. She says Eliza was to have an income payable quarterly, commencing first week in December, and the papers disclose as much in a very brief way, and the trusts were created by William accordingly. She says that Ellis was to be immediately summoned by telegraph, and it appears that he was sent for and that he came; also that he was to be the recipient of ten thousand dollars of Peter's bounty, and these · papers as well as other evidence prove that to have been true.

It is urged against the consistency of Miss Fairbanks' testimony that, while these memoranda do show that other subjects besides those named were talked over in the interview between the brothers, she does not recollect any of them. But she says

that other matters were talked about and that she does not remember them for the reason that they were of no interest to her. She did not then personally know William Grant, and only knew of him through the regard manifested by Peter Bradstreet for him in the frequent conversations with her about the family. There is no doubt whatever in our minds that she heard much of a conversation or of conversations between Peter and William concerning the distribution of Peter's property. She told the story of it to different reputable persons soon after Peter's death when she had neither seen the complainant nor received any communication from him, he then as now residing in a distant state.

The question finally for our determination seems to be whether Miss Fairbanks or William Bradstreet makes the mistake as to a direction by Peter Bradstreet for the payment of an annuity to the complainant, William S. Grant. Hers would be a mistake of commission — an imaginary recollection, his one of omission. She is in no way interested as a witness. He is deeply interested as a witness and party. No class of men know better than judges how much interest may unconsciously warp an honest mind. It would not be at all surprising if the respondent, who relied so much on written notes to guide him, and who made such brief ones for his purposes in these matters, through forgetfulness and mistake, honestly omitted to take down the name of William Grant when it should have been upon his memorandum. It will be noticed that the name of "P. Grant" appears three times on the papers produced by Mr. Bradstreet, and twice on one of them. May it not be that the letter "P" was at least once written when the letter "W" was intended?

We are not unmindful of the frequent cautions which have been expressed by courts in relation to the weight to be given to the evidence of verbal declarations. But in the present instance we do not see that the caution is applicable. The defense does not take the position that the conversation was heard but misunderstood, but that such a conversation was not heard. Had the respondents taken the position, and it were supported by evidence,

VOL. LXXXVII.    39

that although William Grant's necessities were discussed and the conclusion was against an allowance to him, or that at first an allowance was determined upon and afterwards retracted, or, if any explanation were given why he was named by Peter as an object of his bounty and his name should be omitted from the final list, we should have been strongly inclined to accept any such explanation as not inconsistent with the account of the interview given by Miss Fairbanks. But the proposition of the defense, and really also the substance of William Bradstreet's testimony, was to the effect that the name of William Grant was not even mentioned by Peter in the presence of his brother William in any interview shortly prior to Peter's death. Upon that issue we feel clear that the contention of the defendants cannot be sustained.

Among other matters in evidence for the defense, of no material consequence on the present issue, is the testimony of Joseph E. Bradstreet to the effect that, in a conversation with Miss Fairbanks, she said she may have got names mixed and she would not swear that she heard William Grant's name mentioned in the interview testified to by her. This impresses us as a reckless and unreliable statement designed by the witness for purposes of his own. Miss Fairbanks indignantly denies it and explains what she did say. Mr. Cornish, of counsel for the respondents, heard the conversation testified to and could have given his recollection of it but saw fit not to do so. It does not appear that she made any doubtful or equivocal statement to any other person, even to the wife of Joseph E. Bradstreet, to whom she first told her story.

The complainant offered himself as a witness and upon the objection of the defense, whether correctly or not, was excluded from testifying.

Although we have hesitated for some time to announce our conclusion in this case, for fear of some possible error on our part, and because of the high degree of proof required in such a case, still our constantly increasing belief that the verdict of the jury was a just one, and authorized by the proof, requires us to sustain the bill. No other result would be satisfactory.

*Decree below affirmed with costs.*