STOVALL, et al. *v.* STOVALL.

Oct. 19, 1953

No. 38833 39 Adv. S. 42 67 So. 2d 391

*Ward & Ward,* Starkville, for appellants.

*Fred B. Smith,* Ripley, for appellee.

HOLMES, J.

This is an appeal from an interlocutory decree of the Chancery Court of Chickasaw County rendered in the administration of the estate of William Gilbert Stovall, deceased. It involves the question as to whether or not a parol constructive trust was created for the benefit of Mrs. Katherine Fisher Stovall, the widow of the deceased, entitling her to the proceeds of a policy of insurance issued by the Pacific Mutual Life Insurance Company on the life of her deceased husband. The policy was for the face amount of $10,000, and was made payable to the executors or administrators of the estate of the insured, and was pledged by the insured to the Bank of New Albany as security for a loan. After the death of the insured, and the payment of the loan from the funds provided by the policy, the net proceeds of the policy remaining amounted to $8,376.70.

The contest is between Mrs. Katherine Fisher Stovall, the widow of the deceased, and appellee here, and Mrs. Linda Stovall Parsons and William Gilbert Stovall, Jr., children of the deceased, and appellants here. The deceased died intestate on September 7, 1950, leaving his said widow and children as his sole and only legal heirs, and leaving a personal estate of the gross amount of approximately $25,000, exclusive of the insurance here

involved. The deceased had other insurance for the benefit of his said two children in the aggregate amount of approximately $12,000. After the death of the deceased, his said widow, who is the stepmother of said children, qualified as the administratrix of the estate of the said deceased. The widow's petition for the allowance of one year's support was granted in the amount of $3,600.00. After the death of the deceased, the administratrix collected the net proceeds of the insurance here involved and deposited the same with other funds of the estate. In due course, the administratrix filed her final account and her petition for approval and allowance of the same, and alleged in her petition that the proceeds of the Pacific Mutual Life Insurance Company policy constituted no part of the estate of the deceased but belonged to her by virtue of a gift from the deceased in his lifetime, or by virtue of a parol constructive trust created for her benefit by agreements and understanding entered into between the deceased and his said two children, and she sought an adjudication of the court accordingly.

The children answered the petition and denied that there had been any gift of the insurance to the widow by the deceased during his lifetime, and denied that any trust had been created for the benefit of the widow by any agreement and understanding between the deceased and his said children, and denied the claimed right of the widow to the entire proceeds of said insurance. The issue thus raised between the deceased's widow and his children was tried by the court before final action on the administratrix's final account, and after hearing the evidence on this issue, the court rendered an interlocutory decree holding that the evidence was insufficient to show a gift of the insurance to the widow by the deceased during his lifetime, but that it established a parol constructive trust for the benefit of the widow entitling her to the entire proceeds of the insurance. From this interlocutory decree, the court granted this appeal.

The evidence relied upon by the appellee to support her claim to the entire proceeds of the insurance is substantially as follows:

R. C. Stovall, Sr., a member of the law firm of Stovall and Stovall, representing the appellee as administratrix in the matter of the administration of her deceased husband's estate, gave the following testimony:

"Q. After the death of Mr. Gilbert Stovall, did you, at any time, have a conversation with his son, William Gilbert Stovall, Jr., whom I believe is commonly referred to as 'Bill,' in which he discussed with you the matter of a Pacific Mutual Insurance Policy on the life of his father?

"A. Yes, I did have a conversation with Billy, as we call William Gilbert Stovall, Jr.

"Q. I wish you would tell us approximately when that was, where it was, and what he said to you relative to it.

"A. Well, the first conversation was the day after Gilbert's funeral. I believe it was in the office there in Okolona and it related to his father's estate with reference to the insurance that he left, and Billy told me that in addition to the policies for him and 'Sis,' why, there was a policy with Pacific Mutual Life Insurance Company that was payable to his estate and was pledged to the Bank of New Albany for a loan. That his father had told him that that policy at the bank, the Pacific Mutual Policy, was to go to Kay, and that he wanted to see to it that that was done. That when the policy was collected, the proceeds belonged to Kay; that that was the understanding.

"Q. In other words, as I understand you, Bill told you that that belonged to Kay and that was the understanding between him and his father?

"A. That's right.

"Q. And he wanted to see to it that that went to her?

"A. That's right.

"Q. By 'Kay' you are referring to Mrs. Katherine Fisher Stovall?

"A. That's right."

This witness further testified that the next time he discussed the matter with Bill, meaning the appellant, William Gilbert Stovall, Jr., was in a telephone conversation; that he was in Columbus and Bill had called him from Washington, D. C.; that he and Mr. Harvey Lee Morrison, an associate attorney in handling the administration, *after they had discussed what Bill had told each of them that his father had said,* drafted a letter addressed to appellee to be sent to the appellants for their signatures, reading as follows:

"November 3, 1950

"Dear Kay:

"During our father's lifetime he told each of us that it was his wish that you have the proceeds of the Pacific Mutual Life Insurance policy, after payment of the Bank of New Albany loan, that was deposited with that bank as collateral for the loan. In other words, the policy which named his administrator as beneficiary was to be your exclusive property, less the indebtedness it secured.

"This writing is to advise you of our recognition and consent to the fact that the gift of the policy to you by our father was completed during his lifetime, and our wish that the Bank of New Albany deliver the policy to you and that you as administratrix collect the proceeds for your individual use, as above set out.

"With kindest regards from both of us, we are

"Affectionately,

"Mrs. Katherine Fisher Stovall

"2657 Lan Park Road

"Apartment E

"Birmingham 9, Alabama"

The witness said that this letter was sent to Bill and as it was not signed and returned, they wrote him to return the letter in order that they might proceed, and that

it was in response to this that Bill telephoned him. Relating the telephone conversation, the witness said:

"Bill called and expressed hesitancy or objection to handling the distribution of the policy in that manner, as I recall, that, I believe he stated, he would rather for Kay to go on and collect the policy and then he would give her a check for his part of it, something to that effect, and then I mentioned that would be a rather circuitous method of the handling of it, or something to that effect, and then he stated, well, he wasn't sure that his father intended to go through with what he had told him he wanted done. That he hadn't left a will, and he thought he was going to do other things, and he supposed that his father had changed his mind. But, I asked him if his father had ever expressed to him any change of intentions after they had agreed of Kay having the policy, and he said, 'No, he hadn't.' And, the conversation was left with his statement that he would be home in a week or two, something like that. It was near Christmas time then, and then he would see further about it and tend to it."

The witness said that he again had several conversations with Bill after he returned home. The substance of these conversations was that he asked Bill if he was going to carry out his father's intentions, to which Bill replied: "Well, you know, Uncle Bob, I got a family that I got to look out for, and if I don't look out for myself, nobody else will." The witness asked him how that was related to the understanding he had with his father and he made no reply. This witness further related a conversation which he had with the appellant, Mrs. Parsons, in which he quoted her as saying that regardless of Bill's attitude, she was going to see to it that Kay (appellee) got the insurance, "that that was her papa's, dad's *wish*." The witness added that his conversation with Mrs. Parsons relative to the disposition of the insurance was in substance the same as that he had had with Bill.

Harvey Lee Morrison, one of the attorneys representing the administratrix, testified that he had a conversation with Bill both before and after the funeral of the deceased in which Bill told him that his father had told him that the insurance was to go to Kay, and that Bill further said: "I want to be sure, Harvey Lee, that she gets it." This witness further testified that Bill told him that at the time his father talked to him about the insurance he thought that his father had some writing about it. The witness said that an examination of the deceased's papers was made to ascertain if he left a will and that none was found.

The appellee, Mrs. Katherine Fisher Stovall, testified over the objection of the appellants that in conversations which she had with Bill he told her that his father had discussed the matter of this insurance with him and his sister (Mrs. Parsons), and that his father had told them that it was his *wish* that she (the witness) should have the insurance. The witness further said that Bill assured her that she need not worry about the insurance because his father had told him and his sister that it was his *wish* that she (the witness) was to have the policy. The witness also said that Mrs. Parsons stated to her that her father had told her that he *wanted* the appellee to have the insurance.

Ralph W. Beeson testified to conversations which he had with Bill in which he quoted Bill as saying that his father had told him "that the policy was Kay's and that the proceeds were to go to her," and that both he and his sister understood this.

Orlean Guice, a negro practical nurse, who nursed the deceased for a period of two months immediately preceding his death, testified that the deceased had told her that he had three policies, one for his son, one for his daughter, and one for his wife.

The appellee then called to the stand as adverse witnesses the appellants. The appellant, Mrs. Parsons,

testified that she talked only briefly to her father with reference to the policy in question, and her father told her that he had a policy at the Bank of New Albany on which he had borrowed money, and that if agreeable to her, after the debt on it was paid, she let Kay have her share of it.

The appellant, William Gilbert Stovall, Jr., referred to in the testimony as Bill, testified that he was not clear as to what was said in the several conversations which he had with R. C. Stovall, Sr., and Harvey Lee Morrison; that what his father said to him about the policy was, "if it is all right with you and your sister, after the debt is paid, if anything happens to me, I would like for you to let Kay have it;" that when he expressed his willingness for Kay to have the insurance immediately after his father's death, he thought that his father had left some will or writing so disposing of the insurance, but since it had developed that his father left no such will or writing, he thought that the insurance should go to the heirs.

The appellants assign as error the following:

1. That the court erred in admitting the testimony of the appellee to establish her claim against the estate of a deceased person;

2. That the court erred in holding that the evidence was sufficient to create a parol constructive trust in favor of the appellee entitling her to the entire proceeds of the Pacific Mutual Life Insurance policy.

We deem it unnecessary to decide, and we do not decide, the question of the competency or incompetency of the appellee as a witness in her own behalf ▉▉ ▉ since even if she were incompetent to testify upon the ground that she was seeking by her testimony to establish her claim against the estate of a deceased person, the action of the court in permitting her to testify would not constitute reversible error for the reason that her testimony was merely cumulative. Tanner v. Foreman, 212 Miss. 355, 54 So. 2d 483.

We address ourselves, therefore, to the question of the sufficiency of the evidence to establish a parol constructive trust in favor of the appellee entitling her to the proceeds of the insurance involved. The solution of this question necessitates an inquiry into the essentials of a constructive trust.

Sec. 218, 54 Am. Jur., defines a constructive trust as follows:

"A constructive trust, or, as it frequently is called, a trust ex maleficio, ex delicto, a trust de son tort, or an involuntary or implied trust is a trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice. However, a constructive trust does not arise on every moral wrong in acquiring or holding property or on every abuse of confidence in business or other affairs; ordinarily such a trust arises and will be declared only on wrongful acquisitions or retentions of property of which equity, in accordance with its fundamental principles and the traditional exercise of its jurisdiction or in accordance with statutory provision, takes cognizance. It has been broadly ruled that a breach of confidence, although in business or social relations, rendering an acquisition or retention of property by one person unconscionable against another, raises a constructive trust."

Sec. 242 of 54 Am. Jur., lays down the following general rule:

"The general rule is that a constructive trust arises where an heir, devisee, or legatee violates a promise to the testator, expressly made or inferable from words

or conduct, to hold an inheritance, devise, or legacy for another or to give it to another, upon which the testator relied in the making or changing his will in order to favor such other person; but it is generally held in such cases that the proof must establish the facts and circumstances giving rise to the constructive trust with an extraordinary degree of certainty and clarity. . . . It is not essential to the operation of the rule and the existence of a constructive trust under it that the heir, devisee, or legatee should have been active in procuring the inheritance, devise, or legacy, and it suffices for the purpose that by words or conduct he led the ancestor or testator to believe that the testator's intention of benefit to another would be carried out. Furthermore, it suffices, according to some authorities, that by failure to speak when he knew the facts he led the testator to such belief.''

In Winder v. Scholey, 83 Ohio State 204, 93 N. E. 1098, 33 L. R. S. (N. S.) 995, we find the following:

''The trust springs from the intention of the testator and the promise of the legatee. The same rule applies to heirs and next of kin who induce their ancestor or relative not to make a will by promising, in case his property falls to them through intestacy, to dispose of it, or a part of it, in the manner indicated by him. Williams v. Fitch, 18 N. Y. 546; Grant v. Bradstreet, 87 Me. 583, 33 Atl. 165; Gilpatrick v. Glidden, 81 Me. 137, 2 L. R. A. 662, 10 Am. St. Rep. 245, 16 Atl. 464. The rule is founded on the principle that the legacy would not have been given, or intestacy allowed to ensue, unless the promise had been made; and, hence, the person promising is bound in equity to keep it, as to violate it would be fraud. While a promise is essential, it need not be expressly made, for active cooperation or silent acquiescence may have the same effect as an express promise. If a legatee knows what the testator expects of him, and, having an opportunity to speak, says nothing, it may be equivalent to a prom-

ise, provided the testator acts upon it. Whenever it appears that the testator was prevented from action by the action or silence of a legatee, who knew the facts in time to act or speak, he will not be permitted to apply the legacy to his own use when that would defeat the expectations of the testator.''

In Moore v. Crump, 84 Miss. 612, 37 So. 109, quoted in Coleman v. Kierbow, 212 Miss. 541, 54 So. 2d 915, it was held that the character of evidence necessary to prove the essentials of such constructive trust must be clear and convincing.

In Par. 620, 54 Am. Jur., the following general rule is laid down as to the character of proof required:

 ''The general rule is that oral proof of an express trust in realty or personalty which is not required to be in writing, or of facts giving rise to a resulting or constructive trust, must be received with caution. So reluctant are the courts to ingraft a trust by parol on the legal title to real estate, or to enforce an alleged parol trust in personal property, that there is perhaps no better-established doctrine than the one which requires a high degree of proof in order to establish the trust by parol evidence. This rule requiring an extraordinary degree or certainty of proof in this class of cases has been applied or recognized in practically all jurisdictions . . .''

The general rule is further set forth in Sec. 618, 54 Am. Jur., as follows: ''The general rule is that proof of a trust and of the essential elements to its existence must be made with clear and satisfactory evidence. Proof of unbinding promises or of declarations of a purpose or intention not carried out are of no value as proof of a trust, since intention, without being effected, does not create a trust. The evidence must consist of something more than loose conversations with third parties.''

Thus it is seen that in order for the appellee to maintain her claim of a constructive trust, the burden of

proof was upon her to show by clear and convincing evidence the existence of the essential elements thereof. She was required, therefore, to show by this high degree of proof that her husband intended for her to have the insurance, that his children either expressly or by silent acquiescence promised him to carry out such intention, and that he relied upon them to do so, and acting upon such reliance he refrained from changing the beneficiary to his wife or assigning the policy to her, or bequeathing the proceeds to her by will or otherwise providing by writing for her to receive the proceeds of the insurance. We think that the evidence falls short of meeting the high degree of proof which was required in order to establish these essentials of the trust. It is no doubt true that at the time the deceased discussed the matter of this insurance with his children it was his wish and intention that the insurance should go to his wife. There is absolutely no proof, however, that he called upon either his son or his daughter to see to it that this intention was carried out, or that he relied upon either to carry out such intention and refrained from assigning the policy to his wife or willing it to her or otherwise providing by writing for her to receive it. The deceased did not assign the policy to his son or daughter with the request that either collect it and give the proceeds to his wife. No possession or control of the policy was ever committed to the son or daughter. Neither the policy nor its proceeds ever came into the possession of the son or daughter. In fact, after the death of the deceased, the administratrix collected the policy and deposited the proceeds with other funds of the estate. Had the deceased assigned the policy to his son or daughter with the request that either give the proceeds to the wife, and the assignee had either expressly or by silent acquiescence promised to do so, an entirely different case would be presented.

Such are the types of cases relied upon by the appellee, but they have no application to the facts of this case. All that the proof here shows, according to the evidence for the appellee, is that the father said to his children that the proceeds of this insurance was to go to his wife and that such was the understanding between them. Great reliance is had by the appellee upon the testimony that the children stated that this was the understanding. Assuming this testimony to be true, we think it clearly appears therefrom that at the time the father talked to his children, it was understood that he, the father, wanted this insurance to go to his wife, but the proof is absolutely silent as to any assumption by either the son or daughter of any duty or obligation to see to it that the wife received the insurance, or as to any reliance by the father upon his son or daughter to see to it that the wife received the insurance. We think that it is manifest from the entire evidence that the conversations which the father had with his children amounted to no more than the expression by him of a wish or desire that the insurance should go to his wife.

It is significant that the evidence shows that *after the witnesses R. C. Stovall, Sr., and Harvey Lee Morrison, had discussed what the children told them their father had said,* these highly capable and reputable attorneys drafted a letter addressed to the appellee to be sent to the appellants for their signatures intended to authorize the delivery of the insurance to the appellee, and beginning as follows: "During our father's lifetime he told each of us that it was his *wish* that you have the proceeds of the Pacific Mutual Life Insurance Policy, . . ." It is further significant that the only quoted statement of Mrs. Parsons is that she wanted to see that Kay got the insurance, "that that was her papa's, dad's wish." It is further significant that the appellee, whose competency as a witness was challenged, testified that the son told her that "he and his

sister understood, that their father had discussed it with them, and they both understood that it was his *wish* that I should have the policy.'' And further testifying as to her conversation with Mrs. Parsons, the appellee quoted Mrs. Parsons as saying that ''their father had told them that it was his *wish* that I was to have the Pacific Mutual policy.''

We think, therefore, that the evidence as a whole evinces no more than an expression by the deceased of a wish or desire for his wife to have the insurance. The father expressed this wish to his children and the children simply did not demur thereto. There is no proof that either of the children promised expressly or by silent acquiescence to see to it that such wish was carried out or that the father relied upon either to carry it out. The proof fails, therefore, to rise to the high standard required for the establishment of a parol constructive trust. It would be a dangerous doctrine to hold that a constructive trust had been created merely because a father told his children that he wanted this or that item of his property to go to a named individual, and that they understood that this was what he wanted and refrained from making any response thereto. It would open a wide avenue for fraudulent claims to be made against the estates of decedents, and if of itself held to be effective to make a disposition of property would dispense with the necessity of formal testamentary disposition.

We think that the expressed willingness of the appellants for the appellee to have the insurance after the death of the deceased and before it developed that the deceased left no will or other writing is of no material aid to the solution of the problem presented. The daughter said that she was willing for the appellee to have it because that was her dad's wish. The son said that when he expressed his willingness for appellee to have the insurance, he thought that his father had left a will or writing so disposing of it.

It is argued, however, that the chancellor's decision is based upon his finding on the facts and that, therefore, his decision cannot be disturbed unless manifestly wrong. We recognize the uniform rule that the chancellor's finding of facts arising out of conflicting evidence is binding on this Court unless manifestly wrong, and further that reasonable inferences or conclusions deducible from the facts in proof and adopted by the chancellor will control on appeal unless manifestly wrong. Stroud, et al. v. Loper, 190 Miss. 168, 198 So. 46. All that the chancellor found from the evidence was that the appellants, in conversations with third parties, stated that their father had told them that the insurance was to go to Kay and that that was the understanding between them. We do not hold that this finding on the facts is manifestly wrong. We adopt these facts as found by the chancellor. These facts so found by the chancellor, however, furnish only one essential element of the claimed constructive trust, and that is the intention of the deceased. They do not clearly and convincingly supply the other elements essential to the establishment of the trust, that is to say, the promise of the children to carry out such intention, and the reliance by the deceased upon his children to see to it that such intention was carried out. In view of the high degree of proof required for the establishment of a parol constructive trust, and the requirement that proof thereof is to be received with great caution, and the further requirement that evidence sufficient to establish such trust must be clear and convincing, we are of the opinion that the facts as found by the chancellor were insufficient to warrant his inferences or deduction therefrom that all of the essentials of the claimed constructive trust were present, and we are of the further opinion that such inferences and deductions of the chancellor were manifestly wrong.

We accordingly conclude that the decree of the court below was erroneous and that it should be, and it is, reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

*Roberds, Lee, Kyle, Arrington,* and *Lotterhos, JJ.,* concur. *McGehee, C. J.,* and *Ethridge, J.,* dissent. *Hall, J.,* took no part.

---

ETHRIDGE, J., dissenting.

I regret that I am unable to agree with the judgment of the Court, and as it seems to me to involve important principles, I think it advisable to express my disagreement and to give my reasons for it.

There was ample evidence in my opinion to sustain the finding of fact of the chancellor, on conflicting evidence, that the appellants, son and daughter of the deceased, had an agreement and understanding with their father, William Gilbert Stovall, that his widow, Mrs. Katherine Fisher Stovall, appellee, would have the entire beneficial interest in the net proceeds of the life insurance policy in question. This reversal of the chancellor contradicts the established principle that he will not be reversed unless he is manifestly wrong. I also think that the majority opinion errs in holding that an essential element of a constructive trust to pay proceeds of an insurance policy to a third person is a change of position or reliance on the promise of trust by the settlor.

## I.

Before reviewing the evidence it is pertinent to survey briefly the applicable rules of law. They are concisely stated in 29 Am. Jur., Insurance, Sec. 1281: ''It is generally held, upon varying theories, that a promise by the beneficiary to the insured to collect and pay the whole or a part of the proceeds of a policy of insurance to a

third person is valid and enforceable as against the promissor. The great majority of the cases upholding the validity and enforceability of such a promise proceed upon the theory that such an arrangement raises a trust in favor of the third person which is enforceable in equity. . . . The promise of the named beneficiary need not be express in order to render him liable for the proceeds of the insurance. A trust in such proceeds may be predicated upon his implied promise to the insured to pay the proceeds of the insurance to a third person. The implied promise, however, must be established clearly before it can serve the purpose of supporting a trust. . . . It is also generally recognized or specifically held that the promise by the beneficiary of life insurance to the insured to pay the proceeds, in whole or part, to a third person, is valid and enforceable as a trust, even though oral. Such agreements are not regarded as gifts causa mortis, or as testamentary dispositions dependent for validity upon compliance with the law which governs the legality of wills.''

In 102 A. L. R. 588 (1936), is an exhaustive annotation on, ''Validity and enforceability of promise by beneficiary of life insurance to insured to pay proceeds, in whole or part, to third person.'' That annotation at page 589 states: ''A search has disclosed no cases where the policy was made payable to the insured's estate and a promise was made to the insured by the next of kin to pay the proceeds or part thereof to a third person; or to distribute the proceeds among the next of kin in different proportions from those prescribed by the Statute of Distribution.'' Nor has the writer been able to find any cases dealing with exactly the stated proposition, but manifestly the instant question and the principles applicable to it are closely analogous to the subject covered by the above annotation. There also the general rule is said to be: ''It is generally held that a promise by the beneficiary to the insured to collect and pay the whole or a

part of the proceeds of a policy of insurance to a third person is valid and enforceable as against the promissor. This conclusion is reached by three avenues: The first, that a valid, enforceable trust, usually parol, is created thereby; the second, that a contract based upon a sufficient consideration has been entered into for the benefit of a third person upon which he may sue; the third, that the beneficiary is estopped to deny the promise.''

The chancery court decided for appellee on the theory of a parol constructive trust. The great majority of the cases upholding the validity of an oral promise by a beneficiary of life insurance to pay the proceeds to a third person ''proceed upon the theory that such an arrangement raises the trust in favor of the third person which is enforceable in equity.'' And many decisions predicate an oral trust in the proceeds of a life insurance policy where necessary upon an implied promise of the beneficiary to pay such proceeds to a third person. 102 A. L. R. 592. It is also settled that an oral promise serving as the basis of the trust is enforceable. 102 A. L. R. 596.

In brief, it is well-established that an oral promise by a beneficiary to the insured to pay the proceeds of a life insurance policy to a third person is valid. And the pertinent authorities further hold that the only essential elements of such a trust are (1) a declaration of trust by the settlor, and (2) a promise or agreement by the trustee that he will hold the rights in trust for a third person. Vol. I, A. L. I., Rest. of Trusts, Sec. 17. This is well-stated in Rest. of Trusts, Sec. 55 (2): ''Where a person dies intestate in reliance upon an agreement by his heir or next of kin to hold the property which he acquires by such intestacy upon a trust, the heir or next of kin holds the property upon a constructive trust for the person for whom he agreed to hold it.''

The same text at page 167 says: ''If a person dies intestate in reliance upon an agreement by his heir or next of kin to hold the property which he acquires by such

intestacy upon a certain trust, the heir or next of kin will be compelled to hold it upon a constructive trust for the designated purposes. Although the intention of the decedent to create a trust is not evidenced by a will, the heir or next of kin is not permitted to keep the property acquired by him through the intestacy of the decedent, since he would be unjustly enriched if he were permitted to keep it. It is immaterial whether the agreement by the heir or next of kin was in specific words, whether written or oral, or is shown by his conduct.''

In view of the above-stated principles, the majority opinion erroneously and drastically limits the remedy of a constructive trust by requiring that, in addition to an intention to create a trust and a promise of the trustee to do so, there must also be evidence that the settlor relied upon the trustee to do so, ''and acting upon such reliance he refrained from changing the beneficiary to his wife or assigning the policy to her, or bequeathing the proceeds to her by will or otherwise providing by writing for her to receive the proceeds of the insurance.'' The majority opinion points out that there is no evidence, except perhaps by inference, that deceased relied upon his children and refrained from doing anything else with reference to the policy in reliance upon them. But authorities simply do not support the view that there must be a change of position or a failure to change position in reliance upon the trustee. This may be an element where one is suing on the contract theory, 102 A. L. R. 594, and a consideration is necessary but it is not applicable to a suit based upon a constructive trust theory. The only two essential elements for the creation of the trust are the intention to create it and the promise or agreement of the trustee to do so. The effect of the controlling opinion is to drastically limit the constructive trust doctrine by placing on it this additional requirement, which is not supported by the text books or the cases.

A detailed discussion of the cases on this point would serve no purpose here. The annotation in 102 A. L. R. 588, and the quoted part of Sec. 1281, 29 Am. Jur., Insurance, cite and discuss them. Particularly applicable in principle are the following: Legrande v. Legrande, 178 S. C. 230, 182 S. E. 432, 102 A. L. R. 582 (1935); Lashley v. Lashley, 102 So. 229, (Ala. 1924); Waterhouse v. Waterhouse, 29 R. I. 485, 72 Atl. 642 (1909); Coyne v. Supreme Conclave, 106 Md. 54, 66 Atl. 704 (1907); Clark v. Callahan, 105 Md. 600, 66 Atl. 618 (1907); Hutchings v. Miner, 46 N. Y. 456 (1871); Childers v. Breese, 213 Pac. 2d 565 (Okla. 1949); French v. French, 161 Kan. 327, 167 Pac. 2d 305 (1946); Quinlan v. Quinlan, 293 Ky. 565, 169 S. W. 2d 617 (1943); Union Central Life Ins. Company v. MacBrair, 66 Ohio App. 144, 31 N. E. 2d 172 (1940). All of the foregoing cases deal specifically with constructive trusts created by a promise or agreement to hold the proceeds of a life insurance policy in trust for third persons. All of them require only an intention of the insured to create a trust and a promise by the trustee. None of them require a third element, now advanced in the controlling opinion, namely, a change of position or a failure to change position in reliance on the agreement to hold in trust. That factor is pertinent only where the claim is based on a contract theory. We are here concerned only with a constructive trust.

In Benbrook v. Yancy, 96 Miss. 536, 51 So. 461 (1910), and Ragsdale v. Ragsdale, 68 Miss. 92, 8 So. 315 (1890), the Court imposed a constructive trust as to lands, which had been left in the trustee's hands under an oral trust. In both of those cases there is some general language that the trust will not be imposed unless it is clearly shown that the settlor relied on the oral promise, but such statements were not necessary to the opinion, since that factor existed in both of those cases. And even as to land, such requirement is contrary to the great weight of authority. Vol. I, A. L. I., Rest. of Trusts, Sec. 44.

So the Yancy and Ragsdale cases are not authority to support the requirement in the majority opinion that there must be a reliance on the promise of trust before a constructive trust will be enforced. Adcock v. Merchants & Mfrs. Bank of Ellisville, 207 Miss. 448, 42 So. 2d 427 (1949), expressly quotes with approval and follows the above-stated Sec. 44 of the Rest. of Trusts, which omits in a constructive trust the third element which is required by the controlling opinion. Pitchford v. Howard, 208 Miss. 567, 45 So. 2d 142 (1950), and Coleman v. Kierbow, 212 Miss. 541, 54 So. 2d 915 (1951), also expressly adopt the rule of the Rest. of Trusts, Sec. 44, in which it is stated that the transferee holds the interest upon a constructive trust if the transferee was in a confidential relation to the transferor. Hence the general rule and that applied in recent Mississippi decisions requires only the intention to create a trust and a promise or agreement to do so. They do not include in it the element of reliance or a change of position, which, with deference, the controlling opinion has now added to the requisites of a constructive trust.

## II.

With the above discussed principles of law in mind, a survey of the evidence in this case shows in my judgment that the chancellor was amply warranted in finding that the deceased intended to create a trust in the proceeds of the insurance policy, and that his son and daughter expressly agreed to that intention. At the minimum, the trial court was warranted in holding that an agreement was inferable from appellant's words, silence and conduct.

R. C. Stovall, Sr., an attorney, banker and railroad president, testified for appellee, Mrs. Katherine Fisher Stovall, later referred to herein as Mrs. Stovall. He stated that the day after the funeral of his deceased brother, William Gilbert Stovall, he had a conversation with the deceased's son, William Gilbert Stovall,

Jr., herein referred to as Stovall, Jr., and Bill. He said that Bill told him that his father had left a policy with Pacific Mutual Life Insurance Company which was payable to his estate and was pledged to the bank for a loan; and that Bill then said: "That his father had told him that that policy at the bank, the Pacific Mutual Policy, was to go to Kay, and that he wanted to see to it that that was done. That when the policy was collected, the proceeds belonged to Kay; that that was the understanding." Q. "In other words, as I understand you, Bill told you that that belonged to Kay and that was the understanding between him and his father?" A. "That's right." Q. "And he wanted to see to it that that went to her?" A. "That's right."

About two months after the death of the intestate, the witness, who, along with Harvey Lee Morrison, were members of the same law firm and were handling the administration of the estate, directed a form of letter in accordance with the attorneys' conversations with Bill and his sister, Mrs. Linda Stovall Parsons, herein referred to as Mrs. Parsons. The letter was addressed to "Kay," the appellee, and was to be signed by Mrs. Parsons and her brother, Bill. It stated that during their father's lifetime he had told each of them that it was his wish that appellee would have the proceeds of the Pacific Insurance policy, and that they recognized that gift. Mrs. Parsons signed the letter and sent it to her brother in Washington. Bill telephoned R. C. Stovall and said that he would rather for appellee to collect the policy and that he would then give her his check for his part of it; and said he was not sure that his father intended for him to go through with that transaction. Later at the farm of R. C. Stovall, Bill had the following conversation with him: "Well, I asked him if he was going to carry out his father's intentions and agreement that they had about it, and he said, 'Well, you know, Uncle Bob,' he says,

'I got a family that I got to look out for, and if I don't look out for myself, nobody else will.' I asked him how was that related to the understanding he had with his father, and that was—(interrupted)—'' Q. "Did he make any reply to that?'' A. "No.'' Q. "After he told you in this first conversation on the day after his father's death, or after his father's funeral, that there was an agreement between him and his father, that Mrs. Kay Stovall was to have this insurance, did he ever, thereafter, tell you that there was no such agreement or that his father changed his discussions or requests in that regard?'' A. "Never at any time.''

The witness also testified that Mrs. Parsons said that regardless of Bill's attitude that she was going to see that appellee got the insurance because that was her father's wish. Q. "If I understand, then she did state that her father talked to her about it, and they agreed relative to it and that she would see to it that Mrs. Stovall got the insurance?'' A. "Yes, that was the basis of the letter which was sent to them jointly to send to Mrs. William Gilbert Stovall because there wasn't any difference as to what they told me that their father said, in substance, to each of them about their stepmother.'' Q. "In other words, the substance of what each told you what their father had said to them was the same?'' A. "That's right, . . .'' With reference to his conversations with the administratrix, the appellee, R. C. Stovall further testified: Q. "And she subsequently handled that policy and the proceeds from it, pursuant to advice from you and your partner in the firm of Stovall & Stovall, is that right?'' A. "Just how she handled it, I couldn't say, other than I didn't have anything to do with keeping her records, etc., other than it was understood, thoroughly, that the matter was settled between the children and that she was not going to make any disposition of it; that it was her property; it was her money and that was all there

seemed to be to it. That when the six months expired
that she could go on and pay the claims."

With reference to his telephone conversation with Bill
around December 1, 1950, R. C. Stovall testified: "It
seems he thought that the collection of it was being held
up by his failure to write her, and that he would ef-
fect the intention or carry out the intention of his fa-
ther, if necessary, by giving her a check." Q. "Now,
was it in that conversation that he expressed doubt of
what his father really intended in the matter?" A.
"Never expressed any doubt whatever about this insur-
ance in the dozens of conversations we had, and there
was never any variance from that. The only doubt
he expressed was whether his father left a will. At one
time, he mentioned something about the house." Q.
"He didn't say anything to the effect that he was not
sure that his father intended for this insurance matter
to go through as it was originally suggested?" A. "He
may have made some explanation. It seems it was con-
nected with the fact that the deed to the house wasn't
in his name as he thought, and that he must, to use his
words, 'Look out after my family.' That if he didn't,
nobody else would." Q. "In other words, his under-
standing with reference to this insurance policy was in
some way connected with the matter of the disposition
of the house, in his mind?" A. "Not at all. Not at
all. At the time it was always definite, at the time
the insurance was discussed and agreed upon between
him and his father. . . ." Q. "Did you understand
from your conversations with Bill that his understand-
ing about this insurance that he knew all the time that
it was in the Bank of New Albany?" A. "Yes." Q.
"That Bill knew that?" A. "Yes, he knew that the
policy was there and that it had a loan on it, and that
the difference was to go to Kay, Mrs. William Gilbert
Stovall."

Harvey Lee Morrison, a member of the law firm of
Stovall and Stovall, testified that before the funeral of

deceased, Bill had a conversation with him about the
Pacific Mutual policy, and then said: "He said his
father had a policy put up at the Bank of New Albany,
and that his father had told him and Linda Lou that
the proceeds from that policy, after the payment of
the loan, was to go to Kay, and he told me, 'I want to
be sure to see, Harvey Lee, that she gets it.'" Q.
"Now, after the funeral and before he left Okolona,
did he discuss it with you again?" A. "Yes, sir, we
had another conversation, and, I believe it was in my
office, but I am sure we had another conversation about
it, in substance, the same thing that his father had told
him about this policy, and that it was put up with
the Bank of New Albany for a loan, and that his fa-
ther said the proceeds from that policy, after this loan,
was to go to Kay and to be hers, and impressed upon
me again that he wanted to be sure to see that it was
done and handled in that way." Morrison said that
the deceased had two other policies that were payable
to his son and daughter in a total amount of about $12,-
000. Morrison testified that about Christmas 1950 he
had a conversation with Bill: "Bill came in the of-
fice and said he wanted to talk to me about that pol-
icy and why he hadn't executed the instrument, and
that after he had been thinking about it, he decided he
had to think of his own family, and look out for them,
and I said, 'How does that change about what your
father told you?' 'Well, at that time I thought there
would be some writing about all this.' I said, 'Did your
father ever tell you there was some writing about it?'
He said, 'No.' 'Did your father ever change his atti-
tude about the insurance policy and what he wanted to
do with that policy?' He said, 'No.' I said, 'I don't
understand the fact that you thought something was
going to be in writing that didn't show up would change
the actual instructions that your father had given
you.'" Q. "Do you remember if he made any reply,
and if so, what?" A. "No, nothing in particular." Q.

"After this first conversation with Mr. Bill Stovall in your home prior to the funeral and the conversation in your office after the funeral in which he told you about his father's direction that Mrs. Katherine Stovall was to have this insurance, did he ever after that time tell you that that was not the agreement or that his father, in anywise, changed his statement or wishes in that regard?" A. "Oh, no, he never did. I asked him that in this discussion Christmas."

The appellee, Mrs. Katherine Fisher Stovall, widow of the intestate, testified concerning conversations she had had with Bill and Mrs. Parsons after her husband's death. One conversation with Bill was immediately after the funeral, and one with Mrs. Parsons was early in 1951. Her testimony is substantially to the same effect of that of R. C. Stovall and Morrison.

Ralph W. Beeson of Birmingham testified that his family and Mr. and Mrs. William G. Stovall had adjoining apartments in Birmingham prior to the former's death and that he knew Bill. About one day after the funeral Bill came to the apartment and Beeson gave the keys to him, pursuant to the prior request of appellee. Bill stated to him that he was interested in and anxious to locate a life insurance policy which his father had owned. Beeson testified with reference to what Bill told him: "He stated that his father told him that this policy had the beneficiary changed to the insured's estate in order that he might make a loan against the policy, but that the policy was Kay's and that the proceeds were to go to her. He said that both he and Linda Lou understood this and that his purpose for trying to locate the policy now was to expedite settlement and to try to see that the proceeds went direct to Kay and were not considered as a part of the estate. . . . that he was anxious to see that the policy was located and that the proceeds not go through the estate but direct to Kay. . . . In the conversation he mentioned two different things. One was that the

policy was Kay's. At another time he stated that he wanted to work direct with the General Agent, whom he knew, and rush collection as he knew that Kay needed the money and that it was hers and not actually a part of the estate."

Orlean Guice, a Negro practical nurse, who nursed W. G. Stovall during the last two months of his life, testified that the deceased told her that there were three insurance policies and one was for Bill, one was for Mrs. Parsons, and one for appellee, and, "He said the children understood."

Mrs. Parsons testified that her father had told her of the policy and that "when the time came, that if it was agreeable with me," that she should let appellee have the proceeds after debts were paid. She admitted that she had signed the letter prepared by the Stovall law firm which was addressed to appellee, and sent it on to Bill; that her purpose was to carry out her father's request; but after talking to Bill, since she understood it was up to them, she changed her mind.

Stovall, Jr., testified that his father had told him to let appellee have the policy "if it is all right with you and your sister, after the debts are paid." He said that he was "not too clear" about what he told appellee; that he could have said that his father had "some intention for it to go to her"; that he "did more or less say that he may have talked to me." He did not recall telling Beeson what Beeson testified, although he may have mentioned the policy "in vague terms." He said that he believed "I have made many statements in connection with this" but that his father left it to him and his sister to decide. He never did tell his father that he would not give appellee the insurance money, and he said he never did tell him that he would, but that he just remained silent. This is in direct contradiction with the testimony of R. C. Stovall and of Morrison, in which they said that he told them there was an "*agreement*" and "*understanding*" with his father.

He further testified that he "could not say definitely what I said to the exact terms that I would use in saying to anyone concerning the policy," in his talks with R. C. Stovall and Morrison. He did not deny categorically what the latter witnesses testified that he told them. Bill testified that in conversations with his father he was "very strongly and bitterly against the sale" of his father's property in Okolona, but his father finally sold it.

The chancellor rendered an opinion in which he found as a fact that there was an understanding and agreement between the deceased and his two children that the appellee would have the net proceeds of the insurance policy; and that Bill and Mrs. Parsons had so stated to R. C. Stovall, Morrison,and Beeson. The final decree imposed a constructive trust on the proceeds of the policy and expressly adjudicated that the deceased in his lifetime "by conversations, agreements and understandings with his daughter and son," and that these parties "by their actions, agreements, understandings and conduct relative to said matter created a constructive trust in favor of" the appellee. The court allowed an interlocutory appeal from that decree.

### III.

**The foregoing** summary of the testimony contains a number of literal quotations from the transcript. It is noted that R. C. Stovall expressly testified that Bill had told him that there was "an understanding between him and his father" about appellee getting the proceeds of the policy, that there was an "agreement" to that effect, and that Mrs. Parsons had substantially the same agreement with her father; that the matter was "understood" thoroughly; and that "the insurance was discussed and agreed upon between him and his father." Morrison testified substantially to the same effect with reference to his conversations with Bill, that he and his sister had an "agreement" with their father for appellee to get the policy. The chancellor neces-

394

sarily rejected the testimony of Bill and Mrs. Parsons in which they stated that their father intended for appellee to get the policy "if it was agreeable" with them. He expressly found an agreement and understanding, expressly made and also impliedly evidenced by the conduct of Bill and his sister after their father's death. Hence I am unable to find any substantial support in the record for the interpretation in the majority opinion that the father had expressed only a wish. The great weight of the evidence, in my opinion, supports the finding that the insured intended to create a trust in the proceeds of the policy for his widow, and that there was an agreement between him and his children to that effect. Under all of the precedents cited in Paragraph I above, this is all that is necessary to create a constructive trust in the proceeds of the policy.

The chancellor was warranted in accepting the testimony of R. C. Stovall, Morrison and Beeson, and in not accepting that of Stovall, Jr., and Mrs. Parsons, in the light of their admissions and conversations with the appellee's witnesses after their father's death. The appellee could establish her case by proof of statements made by appellants. McClosky Brothers v. Hood Milling Company, 119 Miss. 92, 80 So. 492 (1918). Moreover, the testimony of Stovall, Jr., was vague and evasive, and this was another factor which the chancellor was warranted in considering. He could also consider the fact of Bill's opposition to the sale by his father of the Okolona property, and that Bill and his sister were beneficiaries under two other policies of the deceased. Since every element of a constructive trust by promise existed in the present case, the decisions and texts cited in Paragraph I above in my judgment should be followed.

Another significant factor which the chancellor could consider was the manifest inconsistency between Bill's statement that the reason why he had said that appellee

would have the proceeds of the policy was because he thought his father had left a will, and, on the other hand, his numerous and continued statements to R. C. Stovall and Morrison after he had ascertained that his father left no will, still recognizing his and his sister's agreement with their father. The morning after the funeral of the deceased, Morrison, attorney for the estate, Bill, Mrs. Parsons, and appellee went to the bank, opened the lockbox of the deceased and failed to find in it any will. None was later found. W. G. Stoval died on September 7, 1950, and around December 1 of that year, Bill telephoned R. C. Stovall from Washington and for the first time expressed doubt about letting the appellee have the proceeds of the policy. The principal reason which he then gave was that he had thought that his father had left a will, but since he had not, he supposed that he had changed his mind. Yet on September 8, 1950, the date after his father's death, Bill knew that there was no will, and between that time and his conversations with Stovall and Morrison in December, he still continued to recognize his trust agreement with his father, in numerous conversations, with R. C. Stovall, Morrison, and Beeson. Certainly the chancellor could consider that this inconsistency in appellant's position reduced the value of his testimony.

A constructive trust "is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." Beatty v. Gugenheim Exploration Company, 225 N. Y. 380, 122 N. E. 378 (1919). Where confidence is reposed by a father in his son and daughter the court is warranted in finding an existence of a confidential relation. 65 C. J. 482-86. Although the evidence was ample to warrant the finding of an express promise, it is further established that conduct or acquiescence by silence may under proper circumstances be equiva-

lent to a promise. The promise may be inferable from words or conduct. 54 Am. Jur., Trusts, Sec. 242; 20 Am. Jur., Equity, Sec. 567.

Where an ancestor makes known to his heirs his desire that property shall be disposed of in a particular manner and that he relies upon them to carry his desire into effect, and such heirs cause the ancestor to believe that they fully assent thereto, either by words or acts, or silence when they should have spoken, a constructive trust is created. 65 C. J. 468-69. As is stated in Vol. 3, Part 1, Bogert, Trusts and Trustees (1949), p. 8, constructive trusts are based upon and include all conduct which equity treats as unfair, unconscionable and unjust. I think that principle is applicable here.

A father talked with his adult son and daughter about his business. He had an agreement with them that after the debt against the policy was paid, his wife should have the proceeds. Immediately after his death, the children recognized that obligation and told members of the family and attorneys and Beeson, that they wanted that purpose to be carried out. One of them signed a written statement to that effect. In numerous conversations with two attorneys, and in one with Beeson, the children recognized the obligation. Later, after the lapse of time, they became unwilling to carry out the terms of this agreement and understanding. Apparently the father had sold off certain real property in Okolona against his son's wishes. The father had left separate policies to the son and daughter and apparently considered this third policy one for his wife. When the father was talking with his children, he had confidence in them and there was a fiduciary relation between them. They agreed with the father that the widow would receive the proceeds of the policy. The chancellor so found, but at the very least by their silence and conduct, taking their own testimony, they in-

dicated to their father that his wishes would be complied with. At that time the father was mentally and physically capable of changing the beneficiary in the policy, and of writing a will or trust instrument, but he did not do so. After the insured's death, the only way the widow can be protected is by imposing a constructive trust in a court of equity. Under such circumstances I think that the chancellor's decree is amply supported by the evidence and the authorities, and reached a result fully consistent with the historical and juridical functions of a court of equity. For that reason, and with deference, I must dissent from the controlling opinion.

*McGehee, C. J.,* concurs in this dissent.